NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| JERRY DOCAJ, | : | |
| Petitioner, | : | Civil Action No. 13-6120 (CCC) |
| | : | |
| v. | : | **OPINION** |
| | : | |
| STEPHEN D'ILIO, *et al.*, | : | |
| Respondents. | : | |

**CECCHI, District Judge:**

This matter comes before the Court upon the Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254 (Pet., ECF No. 1) filed by Petitioner Jerry Docaj ("Petitioner"), an inmate confined in state prison in New Jersey. Respondents filed an Answer and brief in opposition to habeas relief. (Answer, ECF No. 10.) Petitioner filed a reply. (Petitioner Jerry Docaj's Reply/Traverse Brief in Support of His 28 U.S.C. § 2254 Petition ("Reply") ECF No. 18.)

## I.  PROCEDURAL HISTORY

In March 2005, Petitioner's first murder trial ended in a hung jury in Bergen County Superior Court. (Pet., ECF No. 1, ¶ 2.) His second trial, ending on November 3, 2005, resulted in conviction on three counts: (1) murder, N.J.S.A. 2C:11-3a(1)(2); (2) possession of a weapon for unlawful purpose, N.J.S.A. 2C:39-4a; (3) unlawful possession of a weapon, handgun, N.J.S.A. 2C:39-5b. (Id., ¶¶ 2-3.) On May 27, 2009, the Appellate Division affirmed the convictions but remanded for resentencing. (Id., ¶ 9); State v. Docaj, 407 N.J. Super. 352 (N.J. Super. Ct. App.

1

Div. 2009),[1] cert. denied, 200 N.J. 370 (2009). (Id.) Petitioner's sentence, after several remands for resentencing on appeal, was life imprisonment with 63 years and nine months served without parole eligibility. (ECF No. 1, ¶ 3.)

Petitioner filed a petition for post-conviction relief ("PCR"). (Pet., ¶ 11.) The PCR Court denied the petition on August 30, 2010. (Id.) Petitioner appealed, and the Appellate Division affirmed. (Id.); State v. Docaj, 2012 WL 2529301 (N.J. Super. Ct. App. Div. July 3, 2012). The New Jersey Supreme Court denied the petition for certification on January 16, 2013. (Pet., ¶11.)

Petitioner filed his habeas petition in this Court on October 15, 2013. He raised eight grounds for relief, discussed below.

## II.    BACKGROUND

The factual background in this matter was summarized by the New Jersey Superior Court, Appellate Division upon Petitioner's direct appeal. State v. Docaj, 407 N.J. Super. 352 (N.J. Super. Ct. App. Div. 2009).[2] Petitioner, an Albanian national, and Kathy Docaj, a Yugoslavian who lived in the United States since age nine, were married in an arranged marriage in 1983. They had three children, and lived in Lodi, New Jersey. In February 2003, the time of Kathy's death, their son Christopher was eighteen, their daughter Christina was fifteen, and their youngest daughter was nine. In mid-December 2002, Kathy was involved with another man, Robert Narciso, and she told Petitioner she no longer loved him, and asked him to move out. He moved to an apartment in Lodi in January 2003.

---

[1] Only a portion of the opinion on direct appeal was published. A complete copy of the Appellate Division's decision on direct appeal is attached as Exhibit 5 to the Answer.

[2] "In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

Petitioner had purchased a .38 caliber handgun ten years earlier, which he kept under his bed. He took the handgun with him when he moved out. He began to suspect that Kathy was cheating on him. On February 7, 2003, Kathy called Petitioner and told him she was meeting with a lawyer to prepare papers to file for divorce.

Petitioner's diary showed that he begged Kathy not to divorce him. Petitioner and Kathy were alternating weekends with the children, and Petitioner had the children on February 8 and 9, 2003. Kathy said she was spending the weekend with friends in Atlantic City, but she spent the weekend with Narciso. Petitioner wrote in his diary that he could not understand how someone who loved her husband for nineteen years could go to Atlantic City to celebrate.

Petitioner's diary also showed he was upset that Kathy did not give him anything for his birthday on February 12. He wrote, "I will remember this because one day by the power of God it will come that I will remember that day." Her birthday was two days later, and he gave her a gift. Around this time, she told him she had "another man lined up." Petitioner noticed Kathy wearing jewelry he did not know she owned.

Petitioner's son Christopher, noticing that his mother was spending a lot of time on the telephone, used the "Star 69" feature on the phone to find out who his mother was calling, and he gave the number to his father. On February 17, 2003, Narciso received a call from a man who had an accent. When Narciso asked for the caller's phone number, the caller hung up. A paper with Narciso's phone number on it was found in Petitioner's possession after police arrested him.

Kathy spent the night with Narciso on February 21, 2003. Petitioner spent that night with their children in their marital home. He went to his apartment early the next morning. When he went to work, he brought a book bag containing the .38 caliber gun. He called Kathy that day and

he asked how her night out at the club had been. She told him she was out until 3:00 or 4:00 a.m. He said he would see her later because he wanted to talk to her, to which she replied, "whatever."

Petitioner left work at 6:00 p.m., bringing the book bag containing the handgun back to his apartment. In his apartment, he put the gun in the waistband of his trousers, underneath a vest, and went to their marital home. Kathy, their three children, and two friends of their children were in the lower level of the home. Petitioner and Kathy went upstairs to the kitchen, where they sat drinking coffee and smoking cigarettes. When Christopher came to the kitchen to use the phone, Petitioner asked Kathy to go to the bedroom so they could talk. They went to the bedroom. The door was closed and locked.

Within a minute, Christopher heard his parents screaming and cursing, and noises of pushing and shoving. His mother screamed and he heard a single boom. Christopher began screaming, "open the door." Petitioner opened the door, white-faced, and immediately said, "I'm sorry, I'm sorry." Petitioner tried to block Christopher from seeing his mother, but he saw her lying bloody on the floor.

Christina came upstairs and saw Christopher and Petitioner arguing and struggling. Petitioner told Christina, "she cheated on me for two years" and "she's gone." Petitioner continued to block them from entering the room. Christina dialed 9-1-1, and said she thought her mother was dead. Petitioner could be heard on the 9-1-1 recording yelling, "she was cheating on me," "she was f-ing cheating on me," and "she was cheating on me for one year." Christopher also called 9-1-1 and requested help.

Two police officers from Lodi Police Department arrived and found Kathy lying in a pool of blood on the bedroom floor, and a revolver resting on the lower end of the bed. Christopher was angry and attempting to walk out of the house. Petitioner was in a daze, walking in circles. Not

4

knowing what had happened, police handcuffed Christopher and Petitioner. Petitioner was advised he was not under arrest, and he was not given <u>Miranda</u> warnings.

Investigation showed Kathy died from a single gunshot wound to the back of the head, and she was positioned low in relation to the shooter when she was shot. Petitioner gave a statement to police about what happened in the bedroom. Petitioner denied he had gone to the house to kill his wife. He said he begged her to stay with him, and told her he would forgive her "to this point," but she had looked angry and like she did not want to hear him. According to Petitioner, Kathy had said the only thing he was getting was walking papers, and hit him once in the face.

When Kathy hit him, Petitioner said "things went dark," and he pushed Kathy down but also tried to catch her when it looked like she would hit her face on the floor. Petitioner admitted he had the gun in his hand when he tried to catch her, but he did not remember pulling the gun from his waistband and pulling the trigger, nor did he remember what he did with the gun after shooting Kathy.

## III.   DISCUSSION

### A.   Standard of Review

28 U.S.C. § 2254(d) provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

"Contrary to clearly established Federal law" means the state court applied a rule that contradicted the governing law set forth in U.S. Supreme Court precedent or that the state court confronted a set of facts that were materially indistinguishable from U.S. Supreme Court precedent and arrived at a different result than the Supreme Court. Eley v. Erickson, 712 F.3d 837, 846 (3d Cir. 2013) (citing Williams v. Taylor, 529 U.S. 362, 405-06 (2000)). The phrase "clearly established Federal law" "refers to the holdings, as opposed to the dicta" of the U.S. Supreme Court's decisions. Williams, 529 U.S. at 412. An "unreasonable application" of clearly established federal law is an "objectively unreasonable" application of law, not merely an erroneous application. Eley, 712 F.3d at 846 (quoting Renico v. Lett, 130 S. Ct. 1855, 1862 (2010)).

B.    Analysis

    1.    Ground One

In Ground One of the petition, Petitioner claims that the jury instruction on passion/provocation manslaughter misstated the law, in violation of his Sixth Amendment right to a fair trial, and Fourteenth Amendment right to due process. Petitioner cites the following portion of the jury charge:

> The third factor you must consider is whether the state has proven beyond a reasonable doubt that the defendant had a reasonable time to cool off. In other words, you must determine whether the state has proven that the time between the provoking event and the acts which caused death was inadequate for the return of a reasonable person's self-control.

(Answer, Ex. 20, ECF No. 10-20, 12T214-6 to 10.) The correct charge is that the state must prove that "adequate time" elapsed between the provoking event and the shooting for a reasonable person to have cooled off. The court used the word "inadequate" in the instruction, when it should have said "adequate." In fact, the word "inadequate" is a mistake that appears in the model jury instruction. State v. Docaj, 407 N.J. Super. at 361.

Respondents cite the Appellate Division's decision on direct appeal. Although the error was present in the instruction, all four factors that reduce murder to manslaughter were accurately introduced to the jury, and twice more accurately set forth when the judge "summed up" the State's burden of proof. State v. Docaj, 407 N.J. Super. at 363-64. In sum, there was one error imbedded in three correct instructions regarding the State's burden on the cooling off factor. Id. at 364.

The Appellate Division also found any error was harmless because the only evidence of provocation was a slap in the face, which did not constitute adequate provocation to support passion/provocation manslaughter. Defense counsel argued in summation that the provocation included increasing emotional turmoil from the impending divorce, which was punctuated by the slap. Id. at 367. The Appellate Division found that the lack of proof of adequate provocation posed a critical weakness in the evidence for conviction on manslaughter, that Petitioner's response was not proportionate to the provocation, and that there was evidence that Petitioner brought a concealed and loaded handgun with him that night. Id. at 368-69.

In reply, Petitioner asserts that the jury charge was, at a minimum, hopelessly confusing; and it misstated the State's burden of proof. Petitioner contends the jury instruction relieved the State of its burden to prove every element of the crime beyond a reasonable doubt.

For habeas relief on an erroneous jury instruction, a defendant must show both that the jury instruction was ambiguous, and that there was a reasonable likelihood that the jury applied the instruction in a way that relieved the State of proving every element of the crime beyond a reasonable doubt. Estelle v. McGuire, 502 U.S. 62, 72 (1991). In doing so, the court must consider the challenged instruction in context of the charge as a whole and the trial record, and decide whether the charge so infected the trial that the result violated due process. Id.; Cupp v. Naughten, 414 U.S. 141, 146-47 (1973).

The Appellate Division reasonably applied controlling federal law by considering the challenged instruction in the context of the charge as a whole, and the trial record. The court reasonably concluded that because the passion/provocation manslaughter charge was given accurately three times, and only once with a misspoken word, that the jury followed the correct instruction. Furthermore, as the Appellate Division found, there was little chance the jury would find a slap in the face during an argument over divorce was sufficient to provoke Petitioner to kill his wife, particularly when one considers that he brought a gun to work that day and put it in his waistband before going to see his wife. The Court will deny Ground One of the habeas petition.

    2.    Ground Two

In Ground Two, Petitioner alleges that prosecutorial misconduct in the opening statement was so egregious as to violate Petitioner's Sixth Amendment right to a fair trial and Fourteenth Amendment right to due process. In her opening statement, the prosecutor said the trial "is not about a celebration of Kathy's life . . . what this trial is[,] is a trial to seek justice of her death." (Answer, Ex. 15, ECF No. 10-15, 7T21-7 to 21-10.) The trial court denied the defense motion for a mistrial. Petitioner contends by making this deliberate appeal to the juror's emotions at the outset of trial, the jury was told it was their duty to convict and get justice for the victim.

Respondents argue that the trial judge's instruction cured any possible prejudice. The judge instructed, "[a]rguments, statements, remarks, openings and summations of counsel are not evidence and must not be treated as evidence." (Answer, Exhibit 20, ECF No. 10-20, 12T202-14 to 16); and it was the jurors' duty to:

> weigh the evidence calmly and without passion, prejudice or sympathy. Any influence caused by these emotions has the potential to deprive both the State and the defendant of what you promised them, a fair and impartial trial...

(Id., 12T198-15 to 198-20.) Although the Appellate Division agreed that the comment in the opening statement went beyond recitation of what the State expected to prove, it was not "sufficiently grievous" to prejudice defendant's right to a fair trial. State v. Docaj, 407 N.J. Super. at 362.

In reply, Petitioner cites Viereck v. United States, 318 U.S. 236 (1943), in support of reversal. In Viereck, the Supreme Court found the prosecuting attorney's statements "might well have placed the judgment of conviction in jeopardy," although the Court reversed on another basis. Id. at 247. However, the prosecutor's statements in Viereck were far more egregious than the prosecutor's statements here. During World War II, the prosecutor in Viereck called on the jury to do their duty to their country in a time of war, telling the jury the American people were relying on them for protection, just as they were relying on the soldiers in the Bataan Peninsula. Id. at 247 n.3.

For prosecutorial misconduct to constitute a violation of due process, the conduct complained of must be so egregious as to render the entire proceeding fundamentally unfair. Donnelly v. DeChristoforo, 416 U.S. 637, 642-48 (1974). The effect of the prosecutor's conduct must be viewed in context of the whole trial. Greer v. Miller, 483 U.S. 756, 766 (1987).

The trial judge made very clear to the jury at the beginning and close of trial that it was their obligation to find the facts from the evidence presented to them, and apply the law in reaching the verdict, without considering the lawyers' arguments as evidence. (Answer, Ex. 15, ECF No. 10-15, 7T6-22 to 7-15; Answer, Ex. 20, ECF No. 10-20, 12T202-3 to 202-20.) The Appellate Division was not unreasonable in finding, in the context of the trial as a whole, the prosecutor's statement was not a violation of Petitioner's right to due process and a fair trial.

3.     Ground Three

Petitioner contends, in Ground Three of the petition, that his rights to due process and a fair trial were violated when the detective who interrogated Petitioner repeatedly testified that Petitioner "was not telling the whole truth" and "was trying to hide some things." Petitioner presented a defense of passion/provocation manslaughter and relied in large part on the fact that when he was interrogated by police, he said that "things went dark" after his wife slapped him, and he could not recall the shooting.

The detective testified that Petitioner had insisted he did not go to the house with the intent of killing his wife but "it appeared that he was not telling the whole truth." (Answer, Ex. 19, ECF No. 10-19, 11T38-6 to 11.) Twice more, the State elicited the detective's testimony that Petitioner's statements were less than the whole truth, and that Petitioner was trying to hide some things.

When Petitioner insisted to the detective that he did not remember what happened, the detective accused him of being the person who fired the gun. The detective told Petitioner that his story about not remembering was not reasonable given his recall of everything that happened up to that point. (Id. at 11T50-4 to 51-4 to 7.) Petitioner responded, "I don't f------ remember man." (Id. at 51-6 to 51-7.) Petitioner's defense was that he was telling the detective the truth about not remembering killing his wife.

Respondents contend the context of the detective's testimony is important. During the interrogation, after Petitioner recounted in detail going to the victim's house and arguing with her, Petitioner admitted that he had a gun in his waistband, but did not recall taking the gun out. The detective asked Petitioner whether he went to the house with the intent of killing his wife. When Petitioner answered no, the detective said he did not think Petitioner was telling the whole truth.

10

The trial judge denied defense counsel's objection to this testimony because the detective was only recounting what was said in the interrogation.

In the jury charge, the trial judge reminded the jurors that they were the finders of fact and must determine the credibility of witnesses. (Answer, Ex. 20, ECF No. 10-20, 12T202-3 to 10). The court stressed that, "[y]ou and you alone are the sole and exclusive judges of the evidence, of the credibility of the witnesses, and the weight to be attached to the testimony of each witness." (Id. at 12T202-7 to 202-10.) With respect to petitioner's statement, "I don't f------ remember man," the court instructed that the jury first had to decide whether the statement was made and whether, if made, it or any portion of it was credible. (Id. at 12T229-2 to 229-21). In deciding credibility, the jurors were told to "take into consideration the circumstances and facts as to how the statement was made, as well as all other evidence in this case relating to this issue." (Id. at 12T229-22 to 230-1.)

In reply, Petitioner cites state cases condemning testimony by police officers that expressed an opinion of the defendant's guilt, warning that a jury may be inclined to accord special respect to a police witness. Petitioner argues, the detective's testimony violated his right to a fair trial.

"Federal habeas corpus relief does not lie for state law errors." Estelle, 502 U.S. at 67 (quoting Lewis v. Jeffers, 497 U.S. 780 (1990)). The only question is whether the error so infected the entire trial with unfairness that the resulting conviction violated due process. Id. at 72. The Supreme Court has defined the category of errors that violate fundamental fairness very narrowly. Id. at 73.

The Appellate Division noted the Detective's testimony was not admitted as an expression of his opinion on Petitioner's guilt, but rather that his statements were provided in a detailed description of the interrogation. (Answer, Ex. 5, ECF No. 10-5 at 40.) The testimony provided

context for Petitioner's repeated claims that he did not recall the shooting. (Id. at 41.) The jury was properly instructed that it was their duty to determine whether Petitioner stated he did not remember shooting his wife, and if his statement was credible. (Id.) The detective's statements did not prevent the jury from its function of evaluating Petitioner's credibility. (Id. at 42.)

The transcript of the record, cited above, confirms that the jury was correctly instructed on its duty to consider whether Petitioner was credible when he said he did not remember shooting his wife. Furthermore, it is clear from the detective's testimony that he was describing what was said during the interrogation, and not offering the jury his opinion that Petitioner was guilty of murder rather than manslaughter. Therefore, the Court will deny Ground Three of the habeas petition.

### 4. Ground Four

In Ground Four, Petitioner contends that the trial court denied him the right to a fair trial, the right to remain silent, and the right to due process under the Fifth, Sixth and Fourteenth Amendments, by instructing the jury that the Court had already ruled on the question involving Petitioner's Miranda rights. Petitioner contends reasonable jurors might have taken this to mean the judge believed that the police honored his legal rights during the interrogation. This would suggest to the jury that they could believe the testimony of the interrogating detective, that Petitioner was not telling the whole truth when he said he did not remember. Petitioner asserts this was prejudicial because his defense was based on the jury believing his statements that he could not remember what happened after his wife slapped him.

Respondents again note that the trial judge instructed the jury "[t]here is for your consideration in this case an oral statement allegedly made by the petitioner. It is your function to determine whether or not the statement was actually made by the defendant and, if made, whether

the statement or any portion of it is credible." (Answer, Exhibit 20, ECF No. 1-20, 12T229-2 to 229-7.) Respondents contend that no juror who heard this instruction could take away from it that the trial judge was vouching for the detective's testimony.

In reply, Petitioner points out that New Jersey rules of evidence prohibit a trial judge from informing the jury that the judge has determined police obtained a statement from the defendant in a legally proper manner. (Reply at 49 citing N.J.R.E. 104(c); State v. Hampton, 61 N.J. 250, 272 (1972)). Petitioner's statements to the detective were critical to his defense, and he asserts bolstering the detective's credibility prejudiced the trial. The Appellate Division found this claim without sufficient merit to warrant discussion. (Answer, Ex. 5, ECF No. 10-5 at 42-43.)

To obtain habeas relief, it is not enough for a Petitioner to show an error of State law. Estelle, 502 U.S. at 67. As discussed above, a petitioner must show that an evidentiary error rendered the entire trial, considered as a whole, fundamentally unfair.

Two factors make the Appellate Division's determination reasonable. First, as discussed in Ground Three, it would have been clear to the jury that the detective was not testifying to provide his opinion of Petitioner's guilt, but rather to tell them what occurred during the unrecorded interrogation. Second, even if a juror was inclined to believe the detective was offering his opinion that Petitioner was not telling the whole truth, the judge cured this by telling the jury it was their function alone to determine whether Petitioner was credible when he told the detective he could not remember shooting his wife. The Court will, therefore, deny Ground Four of the habeas petition.

### 5.    Ground Five

In Ground Five, Petitioner alleged his Sixth Amendment right to a fair trial and Fourteenth Amendment right to due process were violated when an Emergency Medical Technician ("EMT")

repeatedly characterized the crime scene as a murder scene, when the defense was that defendant was guilty only of manslaughter. The jury might have accorded the EMT's testimony weight because she had medical training, and she testified that the scene of the crime did not appear the same as other deaths she attended. Petitioner contends this was an improper statement that expressed the EMT's opinion that defendant was guilty. Defense counsel did not request a curative instruction, nor did the trial judge <u>sua</u> <u>sponte</u> instruct the jury to disregard the prejudicial remarks.

Respondents submitted that it was defense counsel, on cross-examination, who asked the EMT if she had ever come upon a scene that looked like this one. She answered, "I've been to scenes [where] people were dead. I've been to DOAs before, but I've never been to a murder scene, no." (Answer, Ex. 17, ECF No. 10-17, 9T170-1 to 170-8.) Later in the cross-examination, she repeated that she had never responded to a murder scene before. (<u>Id.</u>, 9T173-7 to 173-9.) Respondents note the jury received instructions on the whole panoply of homicide charges, from murder, passion/provocation manslaughter, aggravated manslaughter to reckless manslaughter, and this would dispel any prejudice that the jury might have been influenced by the EMT's characterization of the scene as a murder.

Petitioner argues determination of the facts that establish guilt or innocence are exclusively reserved to the jury, and testimony directly related to the ultimate question of guilt rises to reversible error. (Pet., ECF No. 1 at 53 citing <u>State v. Odom</u>, 116 N.J. 65, 77 (1989); <u>State v. Hightower</u>, 120 N.J. 378, 425-26 (1990); <u>State v. Landeros</u>, 20 N.J. 69, 74-75 (1955)).

On direct appeal, the Appellate Division found this claim lacked sufficient merit to warrant discussion. "Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." <u>Harrington v. Richter</u>, 562 U.S. 86, 98 (2011). Petitioner has not met that burden

here. It is unlikely the jury understood the EMT was giving her opinion that Petitioner was guilty of murder when she characterized the scene as a murder scene, rather than merely describing the scene where she found a body lying in a pool of blood with a revolver left lying nearby. Even if the jury were influenced by the fact that the EMT characterized what she saw as a murder scene, the jury was well-instructed on the elements of murder versus the elements of passion/provocation manslaughter, which the jurors knew to be Petitioner's defense. The jurors were instructed that they alone would decide the facts and apply the law to arrive at the verdict. There is a reasonable basis in the record upon which the Appellate Division could have denied this claim.

Therefore, the Court will deny Ground Five.

6.  Ground Six

Petitioner claims, in Ground Six, that he was denied due process and a fair trial when an officer read a Bible passage to the jury. The prosecutor elicited testimony from the officer that a Bible was found in Petitioner's apartment, bookmarked at a certain page where passages had been marked. The prosecutor asked the officer to read the caption of one of the passages. He read, "Psalm 37: The fate of the sinners and the reward of the just." Petitioner contends it is highly prejudicial for the prosecutor to invoke the Bible to infer Petitioner's motive to kill his wife.

Respondents note the Bible was never mentioned on direct examination; defense counsel raised the issue by asking the police officer why pictures of pages of the Bible were taken at the scene but the Bible was not taken into evidence. The detective testified that a page was marked by a bookmark, and several passages were marked, so they photographed that page. Respondents assert the Bible was relevant to show Petitioner's feelings about his wife's betrayal and decision to seek a divorce. Furthermore, there was never any question at trial that the Bible belonged to Petitioner.

15

Petitioner cited State cases holding that reliance by the prosecutor on any religious writing is improper. Furthermore, Petitioner contends the Bible was irrelevant because it was not shown to be his, and no one could know who or why someone marked the passages that were marked or even what it meant if Petitioner had marked the passage.

The Appellate Division found this claim to be without sufficient merit to warrant discussion. Even assuming it was error to admit the testimony, the Appellate Division could have reasonably concluded that the testimony did not prejudice Petitioner. There was more than sufficient evidence during the trial for the jury to conclude Petitioner killed his wife out of anger over her cheating on him and asking for a divorce. He told his children, immediately after killing their mother, that she was cheating on him. On the recorded 9-1-1 call, Petitioner could be heard screaming "she cheated on me." Furthermore, Petitioner had made a statement in his diary, invoking God in his anger at his wife. Even without hearing the passage marked in the Bible, the jury was likely to find Petitioner killed his wife because she cheated on him. For this reason, Petitioner is not entitled to habeas relief on Ground Six.

7.      Ground Seven

Petitioner alleges ineffective assistance of trial and appellate counsel. Respondents contend Petitioner exhausted some but not all of his claims of ineffectiveness of trial counsel, and procedurally defaulted all his claims of ineffective assistance of appellate counsel.

a.      Ineffective Assistance of Trial Counsel

On direct appeal, Petitioner argued that his trial counsel was ineffective for failing to object to the error in the passion/provocation manslaughter charge, failing to object to the jury charge regarding Miranda rights, failing to object to the EMT's reference to the "murder scene," and failing to object to an officer reading a passage from a Bible found in Petitioner's apartment.

(Answer, Ex. 1, ECF No. 10-1 at 45-48.) The Appellate Division, citing <u>Strickland v. Washington</u>, 466 U.S. 668, 688 (1984), found that because all of the underlying claims of trial court error were meritless, counsel could not have been ineffective for failing to object. (Answer, Ex. 5, ECF No. 10-5 at 43.)

The Appellate Division applied the correct standard for ineffective assistance of counsel under <u>Strickland</u>, and reasonably concluded that counsel's performance was not deficient for failing to raise arguments that lacked merit. <u>See</u> <u>Boyer v. Houtzdale</u>, 620 F. App'x 118, 123 (3d Cir. 2015) ("[C]ounsel cannot be ineffective for failing to raise a meritless claim.")

    b.  Procedural default

In general, federal habeas relief may not be granted to a person in custody pursuant to a judgment of a State court, if the person has not exhausted the remedies available in the courts of the State. 28 U.S.C. § 2254(b)(1)(A). "State prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." <u>O'Sullivan v. Boerckel</u>, 526 U.S. 838, 845 (1999). The independent and adequate state ground doctrine "applies to bar federal habeas when a state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement." <u>Coleman v. Thompson</u>, 501 U.S. 722, 729-30 (1991). The doctrine is based on concerns of respecting a State's interest in enforcing its laws. <u>Id.</u> at 730-31. Federal and State courts are "equally bound to guard and protect rights secured by the Constitution." <u>Id.</u> at 731 (quoting <u>Rose v. Lundy</u>, 455 U.S. 509, 515 (1982)).

The procedural default doctrine applies to both state appeal and collateral proceedings. <u>Coleman</u>, 501 U.S. at 732. "[A] habeas petitioner who has failed to meet the State's procedural requirements for presenting his federal claims has deprived the state courts of an opportunity to

address those claims in the first instance." Id. at 731-32. Although the claims are technically exhausted because there are no longer any state remedies available, applying the independent and adequate state ground doctrine in such cases protects "the States' interest in correcting their own mistakes." Id.

To overcome a procedural default of federal claims in state court, a prisoner must demonstrate "cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." Coleman, 501 U.S. at 750. The cause-and-prejudice test applies to procedural defaults at trial and on direct appeal. Murray, 477 U.S. at 489-91 (citing Reed v. Ross, 468 U.S. at 10-11.) For ineffective assistance of counsel to establish cause to excuse a procedural default, the defendant must show counsel's performance was constitutionally ineffective under the Strickland standard. Id. at 488.

In his PCR application, Petitioner alleged trial counsel was ineffective for failing to request a competency hearing or for an adjournment until Petitioner was competent to assist in his defense. (Answer, Ex. 7; ECF No. 10-7 at 4, Point I.) Petitioner also alleged counsel was ineffective for not insisting that an interpreter be present throughout the proceedings because Petitioner had a language barrier, and he lacked funds to hire an interpreter. (Id. at 5, Point IV.) Petitioner further contended that appellate counsel was ineffective for failing to raise ineffective assistance claims. (Id.)

Petitioner procedurally defaulted these ineffective assistance of counsel claims by failing to raise them on appeal of the PCR Court decision. (Answer, Ex. 10, ECF No. 10-7 at 5-6, Points I and II.) A petitioner must exhaust all of his federal claims through one complete round of the State's appellate procedure. O'Sullivan, 526 U.S. at 845. It is now too late for Petitioner to appeal

his abandoned PCR claims, and they are procedurally defaulted. Id. at 838 (failure to timely present federal habeas claims to State Supreme Court resulted in procedural default).

Additionally, the Appellate Division affirmed the PCR Court's decision that New Jersey Rule 3:22-4 barred Petitioner from asserting ineffective assistance of counsel for failing to object to the prosecutor's summation because he could have raised, but failed to raise, the claim on direct appeal. (Answer, Ex. 7, ECF No. 10-7 at 7-8.) In any event, the Appellate Division correctly noted that counsel had objected to some of the comments Petitioner complained of, and the trial court gave appropriate instructions. (Id. at 8.) Therefore, Petitioner's ineffective assistance of counsel claim alternatively failed on the merits. (Id.)

Petitioner now contends appellate counsel's failure to raise these claims on appeal establishes cause and prejudice to excuse his procedural default. (Reply at 69.) In support of his argument, Petitioner states only that he should not be penalized for counsel's failure to raise these issues, and he had expressed his dissatisfaction with counsel to both the Public Defender's Office and the trial judge. (Id.)

> "[T]he existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." Murray v. Carrier, 477 U.S. 478, 488, 106 S. Ct. 2639, 91 L.Ed.2d 397 (1986). Cause, therefore, can be established by showing, for example, that the factual or legal basis for a claim was not reasonably available to counsel or that government interference made compliance with the procedural rule impracticable. Id.; Hull v. Freeman, 991 F.2d 86, 91 (3d Cir. 1993). Attorney error may constitute cause *only where such error rises to the level of ineffective assistance of counsel in violation of the Sixth Amendment.* Murray, 477 U.S. at 488-89, 106 S. Ct. 2639.

Johnson v. Pinchak, 392 F.3d 551, 563 (3d Cir. 2004) (emphasis added).

Petitioner has not alleged an external impediment that might have prevented counsel from raising these claims on review. Furthermore, Petitioner has failed to offer any argument explaining

how counsel's failure to appeal these issues rose to the level of ineffective assistance of counsel in violation of the Sixth Amendment. "<u>Strickland</u> makes clear, 'actual ineffectiveness claims alleging a deficiency in attorney performance are subject to a general requirement that the defendant affirmatively prove prejudice.'" <u>Palmer v. Hendricks</u>, 592 F.3d 386, 398 (3d Cir. 2010) (quoting <u>Strickland</u>, 466 U.S. at 693). Petitioner has not done so here. Therefore, the Court will deny Ground Seven of the petition.

        8.     Ground Eight

In Ground Eight, Petitioner contends cumulative trial errors denied him his rights to due process and a fair trial. The Appellate Division held that because there were no prejudicial trial court errors, the argument that cumulative errors warrant a new trial must also fail. (Answer, Ex. 5, ECF No. 10-5 at 43.) In reply, Petitioner argued that each of the trial errors he raised were of sufficient magnitude to warrant relief.

The cumulative error doctrine is a standalone constitutional claim that the cumulative effect of the errors at trial "so undermined the verdict as to constitute a denial of his constitutional right to due process." <u>Collins v. Secretary of Pennsylvania Dep't of Corr.</u>, 742 F.3d 528, 542 (3d Cir. 2014) (citing <u>Albrecht v. Horn</u>, 485 F.3d 103, 139 (3d Cir. 2007) (holding that petitioner could not show that the cumulative prejudice of trial errors "undermined the reliability of the verdict"). A petitioner must show actual prejudice to be entitled to relief. <u>Id.</u> (citing <u>Fahy v. Horn</u>, 516 F.3d 169, 205 (3d Cir. 2008)).

The Appellate Division reasonably concluded that if Petitioner was not prejudiced by any of the individual alleged trial errors, he could not have been prejudiced based on cumulative errors. The record supports the conclusion that the outcome of Petitioner's trial was not likely to have been different absent the alleged errors, because the evidence strongly supported a finding that

Petitioner went to his wife's home that evening with the intent of killing her. Therefore, Petitioner is not entitled to relief on Ground Eight of his petition.

## IV.    CERTIFICATE OF APPEALABILITY

This Court must determine whether Petitioner is entitled to a certificate of appealability in this matter. See Third Circuit Local Appellate Rule 22.2. The Court will issue a certificate of appealability if the petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Based on the discussion in this Opinion, Petitioner has not made a substantial showing of denial of a constitutional right, and this Court will not issue a certification of appealability.

## V.    CONCLUSION

For the reasons described above, in the accompanying Order filed herewith, the Court will deny the petition for a writ of habeas corpus under 28 U.S.C. § 2254.

Dated: October 27, 2017

_____
CLAIRE C. CECCHI
United States District Judge